

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISON**

| | | |
|---|---|---|
| OMNISURE GROUP, LLC, a Delaware limited liability company, | ) | |
| | ) | 2016L001076 |
| Plaintiff, | ) | CALENDAR/ROOM S |
| | ) | TIME 00:00 |
| | ) | Case No. Breach of Contract |
| v. | ) | |
| | ) | Amount Claimed: $666,886.33 plus |
| NATIONAL REPAIR PROTECTION, LLC, a | ) | interest, attorneys' fees and costs |
| Florida limited liability company, and | ) | |
| RICHARD J. PODHORN, | ) | |
| | ) | |
| Defendants. | ) | |

FILED 16 FEB -2 AM 10:06

**VERIFIED COMPLAINT**

Plaintiff, OMNISURE GROUP, LLC, a Delaware limited liability company

("Omnisure"), by its attorneys, Sorman & Frankel, Ltd., for its Verified Complaint (the "Complaint")

against Defendants, NATIONAL REPAIR PROTECTION, LLC, a Florida limited liability company

("NRP"), and RICHARD J. PODHORN ("Podhorn") (collectively, "Defendants"), states as follows.

**PARTIES, JURISDICTION and VENUE**

1.  Omnisure is a duly registered Delaware limited liability company authorized to

conduct business in the State of Illinois with its principal place of business located at 440 North

Wells Street, Suite 410, Chicago, Illinois. Omnisure is in the business of, among other things,

administering, servicing and maintaining installment payment plan programs with businesses

whereby Omnisure provides installment payment plan arrangements for purchasers of service

contracts and/or product warranties from those businesses, which are Omnisure's customers.

2.  NRP is, upon information and belief, duly registered Florida limited liability

companies with its principal place of business located at 2112 Deborah Drive, Punta Gorda, Florida.

Omnisure/NRP-Podhorn/Complaint

EXHIBIT
1

NRP is in the business of, among other things, selling service contracts and/or product warranties as an agent for third-party providers of administrators and are Omnisure customers.

3. Podhorn is, upon information and belief, a Florida resident with his principal place of residence located at 2112 Deborah Drive, Punta Gorda, Florida. Podhorn is one of the owners of NRP.

4. Venue is proper in this Court pursuant to Section 5/2-101 of the Illinois Code of Civil Procedure, which provides that an action may be commenced "in the county in which the transaction or some part thereof occurred out of which the cause of action arose." 735 ILCS 5/2-101 (West 2016). A portion of the product and services provided to Defendants by Omnisure were performed in Cook County, Illinois and the parties have agreed, as fully set forth below, that any dispute arising from their business relationship shall be adjudicated in Cook County, Illinois pursuant to applicable Illinois law.

## BACKGROUND FACTS

5. On or about October 13, 2014, Omnisure and NRP entered into a Seller Agreement (the "Seller Agreement"), a copy of which is attached as Exhibit "A" and governs the parties' respective rights and obligations. Paragraph M of the Seller Agreement provides that NRP consented and submitted to the jurisdiction of this Court. (See Ex. "A"). Subsequent to that date, the Seller Agreement has been amended from time to time to, among other things, include NRP as a party to same.

6. By virtue of the terms of the Seller Agreement, Omnisure agreed to allow NRP to participate in a "Payment Plan Program" whereby Omnisure finances a third-party's purchase of a service contract or product warranty (the "service contracts") from NRP, acting as agent for the

Omnisure/NRP-Podhorn/Complaint

provider or administrator of the service contracts. Omnisure would then accept administration of the payment plan relating to the service contracts, remit an advance amount to NRP, and subsequently receive monthly payments from the third-party purchaser of the service contracts and/or NRP under certain circumstances. (See Ex. "A").

7. As further set forth in the Seller Agreement, in the event of cancellation of any service contract, Omnisure is entitled to recoup from NRP a certain refund amount as set forth in the Schedule attached thereto. (See Ex. "A").

8. Contemporaneous to the execution of the Seller Agreement, Omnisure and NRP entered into a Security Agreement (the "Security Agreement"), a copy of which is attached as Exhibit "B" and whereby Omnisure was granted a security interest in NRP's collateral as set forth therein. Paragraph 31 of the Security Agreement provides that NRP consented and submitted to the jurisdiction of this Court. (See Ex. "B").

9. Further, contemporaneous to the execution of the Seller Agreement, Omnisure and Podhorn entered into a Guaranty Agreement (the "Guaranty Agreement"), a copy of which is attached as Exhibit "C" and whereby Podhorn guaranteed any and all obligations owing by NRP to Omnisure. The Guaranty Agreement provides that Podhorn consented and submitted to the jurisdiction of this Court. (See Ex. "C").

## COUNT I – BREACH OF CONTRACT (against AS and AG)

10. Omnisure restates and realleges Paragraphs 1 through 9 of the Complaint as and for Paragraph 10 of Count I of the Complaint as if fully set forth herein.

11. Omnisure and NRP executed and entered into the Seller Agreement and Security Agreement whereby the parties agreed to assume mutual obligations for NRP's participation in

Omnisure/NRP-Podhorn/Complaint

Omnisure's "Payment Plan Program." (See Ex. "A" and "B").

      12. The Seller Agreement and Security Agreement are valid, binding and enforceable contracts.

      13. As set forth in the Seller Agreement, NRP promised to repay Omnisure for the financing provided by Omnisure as set forth in the Seller Agreement.

      14. The Seller Agreement further provides that NRP is in default under the Seller Agreement if NRP fails to pay any amount due to Omnisure within five (5) days of the date any such sum is due.

      15. As of the date of filing of this Complaint, and as set forth in the accounting attached as Exhibit "D," NRP has failed and refused to tender required payments to Omnisure due and owing pursuant to the Seller Agreement in the sum of $666,886.33, with further amounts continuing to accrue.

      16. Omnisure has performed all of the conditions by it to be performed pursuant to the Seller Agreement.

      17. NRP's failure and refusal to tender payment to Omnisure pursuant to the Seller Agreement, despite Omnisure's numerous requests that it do so, constitutes a breach of the Seller Agreement.

      18. As a direct and proximate result of the NRP's breach of the Seller Agreement, Omnisure has suffered damages in the principal sum of $666,886.33, with further amounts continuing to accrue, plus interest, costs and attorneys' fees.

Omnisure/NRP-Podhorn/Complaint

WHEREFORE, Plaintiff, OMNISURE GROUP, LLC, a Delaware limited liability company, respectfully requests this Court to enter Judgment in its favor, and against Defendant, NATIONAL REPAIR PROTECTION, LLC, a Florida limited liability company, as follows:

A. Awarding Omnisure damages in the sum of $666,886.33, with further amounts continuing to accrue, plus interest, costs and attorneys' fees; and,

B. For such other, further and different relief as this Court deems just and proper.

### COUNT II – BREACH OF CONTRACT (against Podhorn)

19. Omnisure restates and realleges Paragraphs 1 through 18 of the Complaint as and for Paragraph 19 of Count II of the Complaint as if fully set forth herein.

20. In conjunction with and contemporaneous to execution of the Seller Agreement and Security Agreement, Omnisure and Podhorn executed and entered into the Guaranty Agreement. (See Ex. "C").

21. As set forth in the Guaranty Agreement, Podhorn unconditionally and irrevocably promised and guaranteed payment to Omnisure of all amounts due and owing to Omnisure from and by NRP under or in connection with the Seller Agreement. (See Ex. "C").

22. By entering into the Guaranty Agreement, Podhorn induced Omnisure to enter into the Seller Agreement.

23. Podhorn derived direct financial benefit through the Seller Agreement between Omnisure and NRP.

24. The Guaranty Agreement, like the Seller Agreement and Security Agreement, is a valid, binding and enforceable contract.

25. As set forth above, as of the date of filing of this Complaint, and as set forth in the accounting attached as Exhibit "D," NRP has failed and refused to tender required payments to Omnisure due and owing pursuant to the Seller Agreement in the sum of $666,886.33, with further amounts continuing to accrue.

26. Podhorn is in breach of the Guaranty Agreement by failing to pay the amounts due to Omnisure by NRP under the Seller Agreement.

27. Podhorn has performed all of the conditions by it to be performed pursuant to the Seller Agreement.

28. Podhorn' failure and refusal to tender payment to Omnisure pursuant to the Guaranty Agreement, despite Omnisure's numerous requests that he do so, constitutes a breach of the Guaranty Agreement.

29. As a direct and proximate result of the Podhorn' breach of the Guaranty Agreement, Omnisure has suffered damages in the principal sum of $666,886.33, with further amounts continuing to accrue, plus interest, costs and attorneys' fees.

**WHEREFORE,** Plaintiff, OMNISURE GROUP, LLC, a Delaware limited liability company, respectfully requests this Court to enter Judgment in its favor, and against Defendant, RICHARD J. PODHORN, III, as follows:

A.      Awarding Omnisure damages in the sum of $666,886.33, with further amounts continuing to accrue, plus interest, costs and attorneys' fees; and,

Omnisure/NRP-Podhorn/Complaint

B.      For such other, further and different relief as this Court deems just and proper.

Dated:  February 2, 2016.

Respectfully submitted,

OMNISURE GROUP, LLC, a Delaware limited
liability company,
Plaintiff,

David J. Frankel
Kathleen M. Haggerty
Sorman & Frankel, Ltd.
180 North LaSalle Street, Suite 2700
Chicago, Illinois 60601
(312)332-3535
(312)332-3545 (facsimile)
Firm ID#38341

By:      _____
                One of its Attorneys

Omnisure/NRP-Podhorn/Complaint

## Verification by Certification

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that they are a duly authorized representative of Plaintiff, OMNISURE GROUP, LLC. a Delaware limited liability company, and that the statements set forth in this Verified Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that they verily believes the same to be true.

On behalf of Plaintiff, OMNISURE GROUP, LLC. a Delaware limited liability company

**SELLER AGREEMENT** 

This Seller Agreement (this "**Agreement**") is made and entered into on October 28, 2014 (the "**Effective Date**") by and between National Repair Protection, LLC, a Florida limited liability company ("**Seller**"), and Omnisure Group, LLC, a Delaware limited liability company ("**Omnisure**").

Seller sells service contracts or product warranties ("**Contract**" or "**Contracts**") as an agent for a third party provider or administrator (the "**Administrator**"), which Contracts provide for the payment or reimbursement of certain costs for the repair and replacement of certain parts of products acquired by purchasers of Contracts ("**Purchasers**"). Obligations of Administrator under the Contracts may be secured by an insurance policy (the "**Policy**") from an insurance company or other party ("**Insurer**"), which Policy insures the performance or payment by the obligor under a Contract should the obligor be unable to perform or pay.

Administrator desires to provide a payment plan program for Purchasers to pay the aggregate sales price of a Contract on an installment basis.

Omnisure administers, services and maintains an installment payment plan program (the "**Payment Plan Program**").

Seller desires to participate in the Payment Plan Program and Omnisure is, under certain circumstances, willing to permit Seller to participate in the Payment Plan Program and provide installment payment arrangements for Purchasers of Contracts for the benefit of Seller and Administrator under the terms and conditions set forth herein. Each Purchaser who participates in the Payment Plan Program shall enter into an agreement with Omnisure pursuant to which such Purchaser agrees to pay to Omnisure the sales price for the Contract less any down payment made by Purchaser with respect to the Contract (the "**Payment Plan Agreement**").

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

A.      <u>Accepted Contracts and Documentation</u>.  From time to time, Seller will tender Contracts to Omnisure for inclusion in the Payment Plan Program. Omnisure may, in its sole discretion and for any reason, refuse to accept any account or Contract in the Payment Plan Program, and Omnisure shall not be liable to Seller or any other party on account of such refusal. For each of the Contracts that Omnisure accepts (each, an "**Accepted Contract**"), Seller shall deliver to Omnisure electronic copies of the originals of Purchaser's Payment Plan Agreement as well as any other documents required by Omnisure. Seller's delivery of documents and information shall be made in compliance with Omnisure's policies, now existing or hereafter created.. Seller shall maintain duplicate originals of all documents in connection with each Accepted Contract and shall immediately deliver such duplicate originals to Omnisure upon Omnisure's request. Seller shall maintain executed copies of all documents in connection with each Accepted Contract; provided, however, that Seller may accept authorizations from Purchaser by telephone if, an only if, Seller records all such telephone authorizations and maintains such recordings for a period of at least 48 months. Upon Omnisure's request, Seller shall immediately deliver to Omnisure duplicate copies of such recordings.

B.      <u>Down Payment</u>.  Unless otherwise agreed by Omnisure in writing, Seller shall require all Purchasers to make and Seller shall collect a down payment with respect to each Accepted Contract equal to not less than 5% of the sales price of the Contract (the "**Down Payment**").

C.      <u>Omnisure Fee</u>.  Omnisure shall receive the applicable fee for each Accepted Contract included within the Payment Plan Program, as determined by Omnisure (the "**Discount Amount**"). The Discount Amount is subject to modification from time to time at the sole discretion of Omnisure. Should the Contract be cancelled prior to Purchaser making all monthly installment payments to Omnisure, then the applicable portion of the Discount Amount previously paid to Omnisure shall be refunded to the Seller in accordance to the Cancellation Pricing set forth in Appendix A. Once the Discount Amount is deemed to be fully earned pursuant to Appendix A, Seller shall not be entitled to a refund of any portion of the Discount Amount.

D.      <u>Advances to Seller</u>.

1.      *Advance Payment Date*. Following Omnisure's receipt and acceptance of an executed copy of the required documents with respect to an Accepted Contract, Omnisure shall advance to Seller the Advanced Amount as follows: (a) For 50% of the Accepted Contracts received, Omnisure shall advance the Advanced Amount within

Seller ____

approximately 7 to 10 days ("Upfront Funding"); and (b) for the remaining 50% of Accepted Contracts received, Omnisure shall advance the Advanced Amount approximately 7 to 10 days after and only when and if Omnisure shall have received from Purchaser payment of one installment pursuant to the Payment Plan Agreement ("1ˢᵗ Pay Funding"). Each Accepted Contract subject to Upfront Funding shall be referred to as an "Upfront Contract" and each Accepted Contract subject to 1ˢᵗ Pay Funding shall be referred to as a "1ˢᵗ Pay Contract."

2.      *Calculation of Advances to Seller.* For purposes of this Agreement: (a) "**Advance Rate**" shall mean the percentage of the Seller Profit per Accepted Contract, as set forth in Appendix A, that shall be advanced to the Seller; (b) "**Seller Profit**" shall mean the amount of the sales price of the Contract that Seller is entitled to receive; (c) "**Seller Cost**" shall mean the amount of the sale price of the Contract that Administrator is entitled to receive; (d) "**Reserve Amount**" shall mean the holdback per Accepted Contract as set forth in Appendix A; (e) "**Administrator Refund Portion**" shall mean the portion of the Seller Cost due from Administrator upon Contract cancellation in accordance with that certain Administrator Agreement as between Omnisure and Administrator; and (f) "**Advanced Amount**" shall mean the pool of 0-Pay Advances and 1ˢᵗ Pay Advances to be disbursed to Seller. Omnisure, in its sole discretion, shall be entitled to modify the Advance Rate from time to time for any reason without prior notice to Seller. The total amount advanced to Seller per Accepted Contract shall be calculated as follows:

   (i)     *Up-Front Funding.* For each Upfront Contract, Omnisure shall advance to Seller an amount equal to (i) the Advance Rate multiplied by (ii) the Seller Profit, less (iii) the amount of the Down Payment, less (iv) the Discount Amount, and less (v) the Reserve Amount (the "0-Pay Advance").

   (ii)    *1ˢᵗ Pay Funding.* For each 1ˢᵗ Pay Contract, Omnisure shall advance to Seller an amount equal to (i) the Seller Profit, less (ii) the amount of the Down Payment, less (iii) the Discount Amount, and less (iv) the Reserve Amount (the "1ˢᵗ Pay Advance")

3.      *Right to Withhold or Offset.* In the event Omnisure, in its sole discretion, deems itself insecure for any reason, Omnisure shall be entitled to (i) withhold and retain the Advanced Amount or a portion of the Advanced Amount until such time as the insecurity is cured; or (ii) offset any and all amounts due from Seller to Omnisure under this Agreement or otherwise ("Seller Obligations") from any and all amounts which would otherwise be advanced by Omnisure to Seller.

4.      *Excess Payments.* Omnisure shall have no obligation to pay Seller the Reserve Amount or any amounts in excess of the Advanced Amount until Omnisure has determined, in its sole discretion, that Seller has fully, finally and irrevocably satisfied all direct and contingent obligations to Omnisure hereunder or otherwise. For the purposes of this Agreement, any non-advanced funds shall be referred to as the "Reserve." Seller acknowledges that the amount due to Seller, if any, cannot be calculated until such time as all Seller Obligations have been fully and finally satisfied.

5.      Volume Based Incentives.

   (i)     Volume Thresholds. Omnisure shall pay to Seller a volume bonus ("Volume Bonus") when and only if Seller delivers to Omnisure a fixed minimum volume of Accepted Contracts per month in accordance in the following schedule : (i) a $100,000 bonus when and only if Seller maintains a minimum of 500 Accepted Contracts per calendar month as averaged over the course of a calendar quarter ("First Threshold"); (ii) an additional $50,000 bonus when and only if Seller maintains a minimum of 750 Accepted Contracts per calendar month in any calendar quarter ("Second Threshold"); (iii) an additional $50,000 bonus when and only if Seller maintains a minimum of 1,000 Accepted Contracts per calendar month in any calendar quarter ("Third Threshold"); and (iv) an additional $150,000 bonus when and only if Seller maintains a minimum of 1,200 Accepted Contracts per calendar month in any calendar quarter ("Fourth Threshold", and collectively with the First Threshold, Second Threshold and the Third Threshold, the "Volume Thresholds, and each a "Volume Threshold"). For the purposes of this paragraph D(5), the minimum volume requirement shall mean only the net origination of Upfront Contracts and 1ˢᵗ Pay Contracts for which the consumer has paid at least 1 installment under the Payment Plan Agreement . Once realized, each Volume Threshold shall be maintained for a period of no less than 2 years.

Seller

      **(ii)**    <u>Volume Bonus Payment Date.</u> Omnisure shall pay to Seller a Volume Bonus for each Volume Threshold within 90 days following the calendar quarter in which the Volume Threshold is earned. In the event that there are any shortages in the Reserve, as calculated and determined by Omnisure, Omnisure shall credit the Volume Bonus to the Reserve in lieu of direct payment to Seller.

      **(iii)**    <u>Limit on Volume Bonuses.</u> A Volume Threshold is deemed fully earned by Seller once paid, and in such cases, Seller shall not be entitled to another Volume Bonus for attaining or maintaining the same Volume Threshold. The maximum cumulative total of Volume Bonuses paid to Seller shall not exceed $350,000.

      **(iv)**    <u>Repayment of Volume Bonus.</u> Each Volume Bonus paid to Seller shall be immediately reimbursed to Omnisure by the Seller upon the occurrence of any of the following: (i) Seller fails to maintain a Volume Threshold once realized; (ii) Seller fails to present to Omnisure any Accepted Contracts for inclusion in the Payment Plan Program for a period of 10 consecutive days; (iii) an Event of Default; or (iv) a material breach of the Seller Agreement by Seller. Omnisure shall deduct any Volume Bonus amounts owed to Omnisure from the next disbursement of the Advanced Amount; provided, however, if the Advanced Amount is less than the Volume Bonus amounts owed, Omnisure shall either (i) deduct said amounts from the Reserve; or (ii) if there are shortages in the Reserve such that the Reserve does not reasonably exceed the Volume Bonus amounts owed and all of Seller's obligations to Omnisure under this Agreement, Seller shall pay to Omnisure all Volume Bonus amounts due within 15 days following any demand made by Omnisure for reimbursement of said amounts.

**E.**    **Refunds.**

    **1.**    *Involuntary Cancellation.* If a Purchaser fails to make any payment under the Payment Plan Agreement when due, Omnisure shall send a late notice to the Purchaser. If Omnisure fails to receive payment, including any applicable late charges, from the Purchaser within the 10-day period (or later as required by applicable law) following the mailing of the late notice, Omnisure shall have the right to cancel such Contract and send a cancellation notice to Purchaser, Seller and Administrator. In the event of any other event of default under the Payment Plan Agreement, Omnisure shall have the right to cancel the Contract and send a cancellation notice to Purchaser, Seller and Administrator. The Contract shall be deemed cancelled effective on the date set forth in the cancellation notice and Seller shall pay to Omnisure the Refund Amount in accordance with Section E(3) below.

    **2.**    *Purchaser Cancellation.* Each Purchaser shall have the right, under the relevant Contract and Payment Plan Agreement, to cancel any Account and the related Contract and Payment Plan Agreement at any time without further obligation to Administrator, Seller or Omnisure. If Seller receives notice from Purchaser that Purchaser intends to cancel its Contract, then Seller must (1) immediately notify Omnisure and Administrator of the Purchaser's cancellation and (2) pay to Omnisure the Refund Amount in accordance with Section E(3) below.

    **3.**    *Calculation of Refund Amount.* If Omnisure or a Purchaser requests to cancel any Accepted Contract or an Accepted Contract is otherwise cancelled for any reason, Seller shall refund to Omnisure the following amount (each, a **"Refund Amount"**): (a) the sales price of the Contract; <u>plus</u> (b) any late payment charges, NSF charges, chargeback amounts and related chargeback fees, and any other bank-related fees and/or penalties due to Omnisure; <u>less</u> (c) the amount of the Down Payment; <u>less</u> (d) any payments received by Omnisure from Purchaser on account of such Contract; and <u>less</u> (e) the Administrator Refund Portion.

    **4.**    *Payment of Refund Amount.* For any Upfront Contracts cancelled before Purchaser has made at least 1 installment payment under the Payment Plan Agreement, Omnisure shall deduct the Refund Amount from amounts held in the Reserve. For any and all (i) Upfront Contracts cancelled after the Purchaser has made at least 1 installment payment under the Payment Plan Agreement; (ii) cancelled 1" Pay Contracts; and (iii) amounts due to Omnisure as a result of adjustments to the sales price of the Accepted Contract after the Advance Amount has been advanced to Seller, Omnisure shall deduct the Refund Amount directly from each weekly disbursements of the Advanced Amount; provided, however, that if the Advanced Amount is less than the Refund Amount, or should the Seller cease to offer Omnisure new Contracts, Seller shall promptly pay to Omnisure the Refund Amount with respect to any cancelled Contract. In the event that Omnisure does not receive the full amount of the Administrator

Seller 

Refund Portion with respect to such Contract within 60 days following that date of cancellation of such Contract, Omnisure shall deduct the unpaid portion of the Administrator Refund Portion with respect to such Contract from the next disbursement of the Advanced Amount.

     5.    *Payments from Administrator.* If Omnisure has not received the full amount of any Refund Amount, other refund or any other amount due from Seller hereunder within 60 days following the date of cancellation of any Accepted Contract or the date such payment is otherwise due, Seller hereby authorizes the applicable Administrator, upon notice from Omnisure and with no further action required by any other party, to remit such amounts directly to Omnisure out of any funds due from Administrator to Seller (and Seller hereby releases such Administrator from and against any and all liabilities or damages which might arise out of any such payment directly to Omnisure).

**F.**    <u>Covenants of Seller</u>. During the term of this Agreement, Seller shall:

     1.    follow all Payment Plan Program policies and procedures, now existing or hereafter created, with respect to all Accepted Contracts included in the Payment Plan Program;

     2.    ensure that Purchasers (1) are not offered different pricing on Accepted Contracts based on their decision to pay a lump sum for the Accepted Contract versus participating in the Payment Plan Program, and (2) are not charged any interest or finance fees, or any other amounts that could be deemed to be interest or finance fee charges;

     3.    upon execution of an Accepted Contract, collect the Down Payment from the applicable Purchaser and report to Omnisure the precise amount of the Down Payment actually collected by Seller;

     4.    maintain adequate reserves to pay any and all Refunds, any potential Purchaser refunds and any other amounts which may become due and owing hereunder from time to time;

     5.    in the event an Accepted Contract is cancelled for any reason, after payment of the Refund to Omnisure, promptly refund to the applicable Purchaser the full amount due and owing to such Purchaser (Seller being solely and fully responsible for the payment of such refund) and, to the extent Seller receives any refunds from the applicable Administrator, immediately remit such amount to the applicable Purchaser;

     6.    ensure that each Accepted Contract is genuine, evidences an undisputed bona fide transaction, is not subject to any right of set-off or counterclaim, has a coverage term of at least 36 months and relates only to products included in the Payment Plan Program;

     7.    upon request of Omnisure, provide financial, entity and equity holder information with respect to Seller and its affiliates;

     8.    cause all parties involved in the Payment Plan Program to comply with the Federal Electronic Funds Transfer Act, Federal Reserve Regulation E and any similar local or state laws (collectively, the "EFT Laws") with respect to the transfer of funds between Purchaser and Administrator, Seller or Omnisure by pre-authorized draft or direct debit, which includes (a) with respect to any pre-authorized draft or direct debit, causing Purchaser to authorize such pre-authorized draft or direct debit in accordance with EFT Laws, and (b) upon Omnisure's request, promptly providing copies to Omnisure of all records evidencing such authorizations (it being understood that if this subsection constitutes a delegation of duties required by any EFT Law by Omnisure to Seller, Seller hereby accepts such delegation and agrees to be fully responsible for the performance of all such duties, as if it were primarily responsible under the EFT Laws);

     9.    maintain executed originals with respect to all documents in connection with the Payment Plan Program and each Accepted Contract; provided, however, that Seller may accept Purchaser authorizations by telephone if, and only if, Seller records all such telephone authorizations and maintains such recordings for a period of at least 48 months and, upon Omnisure's request, provides Omnisure duplicate copies of such recordings;

    10.    comply with all best practices policies with respect to Seller's industry or the products covered by the Contracts;

Seller 

11.	conclude each call with a scripted verification of the material contract terms as set forth in **Appendix B;**

12.	ensure that no Accepted Contract is subject to any prior assignment by Seller, claim, lien or security interest against Seller (and Seller will not make any assignment thereof or create any security interest therein, nor permit the same to become subject to any attachment, levy, garnishment, or other judicial process);

13.	promptly notify Omnisure in writing in the event Seller is or becomes subject to an inquiry or investigation by any local, state or federal government or regulatory agency, or any consumer or professional association and provide to Omnisure, upon Omnisure's request, copies of all documents in connection with any such inquiry or investigation;

14.	provide advance, written disclosure to Omnisure of Seller's intent to use any third party dialing services;

15.	comply with all applicable statutes, laws, orders, regulations and decrees;

16.	promptly comply with and/or resolve all complaints, requests for information, or other documents filed with or by any local, state or Federal government or regulatory agency, or any consumer or professional association, a Purchaser or any other third party (collectively, "Third Party Complaints");

17.	not use any form or agreement in connection with Accepted Contracts offered pursuant to the Payment Plan Program that has not been supplied or approved by Omnisure in writing;

18.	not solicit offers from financing companies or lending institutions to finance or obtain financing with respect to any Contract which has been offered to Omnisure, until such time as Omnisure has provided Seller with written notice of Omnisure's refusal to accept such Contract;

19.	not sell, either directly or through an affiliated entity, a Contract to any Purchaser within 180 days of the cancellation of such Purchaser's Accepted Contract (except to the extent such new contract becomes part of the Payment Plan Program);

20.	not grant or allow any lien, security interest, mortgage or encumbrance of any kind upon any portion of the Collateral (as defined below) or otherwise transfer, sell, assign, convey, pledge or permit to be granted any interest of any kind whatsoever in any Accepted Contract;

21.	not issue, incur, assume, create or otherwise have outstanding any indebtedness for borrowed money (including, without limitation, any financing arrangements for Accepted Contracts) without the prior written consent of Omnisure;

22.	not declare or pay any dividend or distribution to any equity holder of Seller, or repurchase any equity owned by any equity holder of Seller following any Event of Default (as defined below) or such that Seller cannot pay to Omnisure all Refunds;

23.	not enter into any written or oral agreement with any Purchaser for any discount or deduction with respect to any Accepted Contract without Omnisure's prior written consent and payment to Omnisure by Seller of an amount equal to the discount or deduction;

24.	not engage, either directly or indirectly, in any "voice blasting" or "robo-calling";

25.	not engage, directly or indirectly, in any form of telemarketing which violates the Telephone Consumer Protection Act of 1991, the Telemarketing Consumer Fraud and Abuse Prevention Act, any Federal Trade Commission rule, order or regulation, any state telemarketing or consumer fraud statute, or any other applicable Federal, state or local law or regulation; or

26.	following the occurrence of an Event of Default, not take any action intended to hinder or prevent any payment of any amounts due to Omnisure, including, without limitation, the cancellation of Accepted Contracts.

Seller 

G.    Term.

1.    *Termination.* This Agreement shall commence as of the Effective Date and continue until terminated by either party for any reason upon written notice to the other party.

2.    *Post-Termination.* Following termination of this Agreement, Seller shall remain obligated to comply with all of the requirements set forth herein in respect of each Accepted Contract including, without limitation, Sections D and E above. This Section shall survive the expiration or termination of this Agreement for any reason.

H.    Events of Default. The occurrence of any one or more of the following events shall constitute an event of default hereunder (each, an "**Event of Default**"): (i) Seller fails to pay any amount due to Omnisure within 5 days of the date when due; (ii) any representation or warranty set forth herein shall be untrue when made; (iii) Seller defaults under any other agreement or contract with Omnisure and/or Administrator to which it is a party; (iv) Seller becomes insolvent, makes an assignment for the benefit of creditors or otherwise is unable to timely satisfy its debts and/or obligations as they become due; (v) proceedings in bankruptcy or for reorganization of Seller or for the readjustment of any of its debts under any bankruptcy law or under any other act or law for the relief of debtors, shall either be commenced involuntarily against or filed by Seller; (vi) proceedings seeking appointment of a receiver, trustee, custodian, conservator or similar official for Seller or for all or any substantial part of its assets, under any existing or future law of any jurisdiction, shall either be commenced involuntarily against or filed by Seller; (vii) Seller breaches any other provision, covenant or obligation set forth in this Agreement; or (viii) the occurrence of any adverse change in Seller's business, Seller's financial situation, Seller's net worth, Seller's risk profile or Seller's prospects, as determined by Omnisure in its sole discretion. Seller hereby agrees and acknowledges that it is fully responsible for all actions taken by parties engaged by or on behalf of Seller in connection with Contracts, and as such, any action taken by any such party in violation of this Agreement shall constitute a breach of this Agreement by Seller.

I.    Certain Remedies.

1.    *Events of Default.* Following the occurrence of an Event of Default, in addition to any other remedies Omnisure may have at law, equity and/or under this Agreement, (i) Omnisure may continue to determine the Advance Rate in its sole discretion, recoup or offset against any and all amounts which may otherwise be advanced by Omnisure to Seller under any and all Contracts, and refuse to accept any Contracts in the Payment Plan Program, (ii) hold all other amounts that are held by Omnisure for Seller or may become due to Seller from Omnisure until all Contracts are paid in full and/or cancelled, all associated accounts receivable have been paid in full, all Purchasers have received any refunds due and owing to them, and Omnisure has received all Refunds and other amounts due and owing to Omnisure under this Agreement or any other agreement between Omnisure and the Seller, and (iii) Omnisure shall be entitled to receive, directly from Administrator, any and all payments due from Administrator to Seller with respect to all Accepted Contracts sold by Seller that are administered by Administrator.

2.    *Affiliated Companies.* Seller hereby acknowledges that from time to time Seller or an entity controlled by, controlling or under common control with Seller or otherwise affiliated with Seller ("**Affiliates**") may be entitled to receive funds from Administrator with respect to reinsurance earned premiums or retro earned premiums or otherwise (the "**Affiliate Amounts**"). Seller shall notify Omnisure in writing of any Affiliates. In the event that any amounts are due from Seller to Omnisure or upon the occurrence of an Event of Default, Omnisure shall have the right, which right shall be senior to any rights of Seller or any other third party, to directly receive any such Affiliate Amounts in order to set off against any Seller Obligations. Seller hereby acknowledges and agrees that Omnisure may instruct Administrator to pay such Affiliate Amounts to Omnisure, and Seller hereby directs Administrator to pay such Affiliate Amounts directly to Omnisure upon receipt of such instruction from Omnisure with respect to the Affiliate Amounts.

3.    *Past Due Amounts; Remedies.* Upon the occurrence of an Event of Default, all amounts due and owing to Omnisure under this Agreement shall accrue interest daily at the rate of 1.5% per month or the highest allowable state maximum rate. Notwithstanding anything to the contrary contained in this Section, all of the remedies set forth above in this Section I and elsewhere in this Agreement are cumulative and do not exclude Omnisure's exercising any other rights or remedies provided at law or in equity. Seller shall be responsible for all costs incurred by Omnisure, including attorneys' fees, in collecting any such past due amounts from Seller.

4.    *Non-Circumvention.* The parties hereby acknowledge that any action taken, or omitted to be

Seller _JAB_

taken, by any of Seller's equity holders or officers which would, had such action instead been taken by Seller, constitute a breach of this Agreement or Event of Default, shall be deemed to constitute an Event of Default hereunder.

5.  *Cessation of Operations.*   Upon the occurrence of a Cessation Event (as defined below), Omnisure shall be entitled (including, without limitation, immediately upon the occurrence of a Voice-Blasting Breach), pursuant to the Power of Attorney attached hereto as Exhibit D, to notify Seller's telephone provider(s) to transfer and/or forward any and all telephone numbers of Seller to Omnisure or a third party agent designated by Omnisure (and Seller will provide whatever assistance Omnisure deems necessary to allow Omnisure to take control over such telephone numbers and transfer them to Omnisure or any such third party). For purposes of this Agreement, "Cessation Event" shall mean the earlier to occur of (i) a VPA attorney determining in writing that Seller has ceased all sales activities, or (ii) Seller's written notice that Seller has ceased all sales activities, or (iii) a determination by Omnisure that Seller has ceased all sales activity based on Seller's failure to present to Omnisure any Contracts for inclusion in the Payment Plan Program for a period of 10 consecutive days without prior written notice that Seller will remain in business but will no longer conduct business with Omnisure.

6.  *Amounts Due From Administrators and Producer Owned Reinsurance Companies.*  Seller hereby acknowledges that from time to time Seller or a producer owned reinsurance company identified in Appendix C (each, a "PORC") may be entitled to receive funds from Administrator with respect to reinsurance earned premiums or retro earned premiums (the "Earned Premiums"). Seller shall notify Omnisure in writing of any new PORCs with which It establishes a relationship following the date hereof or, to the extent tied in any way to Seller's production hereunder, of any new PORCs with which any of Seller's subsidiaries or affiliated entities establishes a relationship following the date hereof (the "PORC Notification Requirement"). In the event that any amounts are due from Seller to Omnisure or upon the occurrence of an Event of Default, Omnisure shall have the right, which right shall be senior to any rights of Seller or any other third party, to directly receive any such Earned Premiums in order to set off against any Seller Obligations. Seller hereby acknowledges and agrees that Omnisure may instruct Administrator to pay such Earned Premiums to Omnisure, and Seller hereby directs Administrator to (i) pay such Earned Premiums directly to Omnisure upon receipt of such instruction from Omnisure with respect to the Earned Premiums, and (ii) provide to Omnisure any information related to the applicable PORC that may be requested by Omnisure from time to time. Under any set of circumstances, no amount shall be paid by any PORC to Seller (including, without limitation, any Earned Premium), without Omnisure's prior, written consent. Seller shall, no later than 5 business days from the date of this Agreement, cause the administrator of each PORC to acknowledge, and to agree to adhere to, this Agreement in writing.

J.  Authorization Regarding Software Providers. Seller hereby agrees, pursuant to this Agreement and the Consent attached hereto as Appendix E, that (i) Omnisure shall be entitled to receive from any CRM Provider any and all reporting information regarding Accepted Contracts which may be in such CRM Provider's possession from time to time, and (ii) each CRM Provider shall be entitled to rely on the Seller Agreement, without any further action on the part of Seller and without the need for any further consent from Seller, and iii) CRM Provider shall be liable in any way on account of providing any information regarding Seller to Omnisure. . For purposes of this Agreement, "CRM Provider" shall mean Moxy, Forte Data Systems and any other vendor who provides Seller with software or services for customer relations management (including, without limitation, sales activities, marketing, customer service, and technical support, or the generation of agreements between customers and Seller).

K.  Waiver. No waiver of any default shall operate as a waiver of any other default or of the same default on a future occasion. All rights and remedies of Omnisure hereunder shall be cumulative and shall be in addition to any other right and remedy given hereunder or now or hereafter existing at law or in equity or by statute.

L.  Changes in Name or Organization. Seller shall not, without at least 30 days' prior written notice of such change, change its jurisdiction of organization; legal name; corporate structure; type of organization; tax identification number; use of any assumed names; or owners, principals or managing members.

M.  Seller Representations and Warranties. Seller hereby represents and warrants to Omnisure that: (i) this Agreement has been validly executed and delivered by Seller and constitutes a valid and binding obligation of Seller; (ii) Seller is duly organized in its state of formation and is in good standing under the laws of its state of formation and all other states where it is required to be in good standing; (iii) there are, as of the date hereof, no liens or security interests on any portion of the Collateral; (iv) all financial statements, accounts receivable summaries, capitalization tables and other materials and information provided to Omnisure prior to the date hereof are true and correct in all material respects and do not fail to state any material facts regarding Seller; (v) Seller maintains internal procedures and controls to comply with all applicable

Seller _____

laws and to promptly resolve all Third Party Complaints; (vi) Seller is in compliance with all applicable laws; (vii) Seller has all necessary licenses, approvals and other authority to carry out its business in accordance with all applicable laws, policies and regulations; (viii) Seller has not, at any time within the past 5 years, received any notice from the Federal Trade Commission, any attorney general, any state's attorney or any other governmental authority or other oversight authority alleging that Seller is not or was not in compliance with applicable rules, laws, ethical standards or policies; (ix) Seller is not insolvent; (x) the execution of this Agreement by Seller and the performance of Seller's obligations hereunder will not (a) result in a breach of any contract to which Seller is a party or by which its assets are bound, (b) result in the creation or imposition of any liens in favor of any third person or entity upon any of Seller's assets, or (c) render Seller insolvent; (xi) Seller is not a party to any litigation or arbitration proceeding as of the date of this Agreement, and no such action has, to the knowledge of Seller, been threatened against Seller; (xii) Seller has notified Omnisure in writing of all "doing-business-as" names it currently uses or has used at any time during the past 5 years; and (xiii) Seller does not engage in "voice-blasting" or "robo-dialing" practices.

N.     Security Interest; Guaranty.  To secure Seller's payment and performance of all of the Seller Obligations. Seller has granted to Omnisure a first priority security interest in all of Seller's assets pursuant to that certain Security Agreement by Seller in favor of Omnisure. The payment and performance of the Seller Obligations is also guaranteed by the guaranty of Todd Beikmann, Richard J. Podhorn, and Thomas Neubarth ("Guarantor") pursuant to that certain Guaranty Agreement by Guarantor in favor of Omnisure.

O.     Indemnity.  Seller hereby agrees to defend, indemnify and hold Omnisure and its members, managers, officers, employees and agents harmless from and against any and all claims, actions, demands, losses, damages, costs, liabilities, claims or other charges, absolute or contingent, matured or unmatured, known or unknown and any and all expenses incurred (including, but not limited to, attorneys' fees and court costs) by such party in connection with or arising out of (i) Seller's breach of this Agreement or breach or alleged breach of any Accepted Contract, (ii) any act or omission of Seller in connection with any Accepted Contract or any other aspect of Seller's business, (iii) any claim by Purchaser with respect to any Contract or the Payment Plan Program, (iv) any action, suit or proceeding by a third party relating to the subject matter of this Agreement, or (v) any cancellation of any Accepted Contract by a Purchaser, Seller, Administrator or Omnisure.

P.     Governing Law; Interpretation.  This Agreement shall be construed in conformity with the laws of the State of Illinois without regard to choice of law or conflict of law rules. The parties hereto irrevocably agree that all actions or proceedings in any way, manner or respect, arising out of or from or related to this Agreement, shall be brought only in courts having situs within Cook County, Illinois. Each party hereby consents and submits to the jurisdiction of any local, state or federal court located within Cook County, Illinois and waives any right it may have to transfer the venue of any such action or proceeding. It is the intent of the parties that this Agreement be deemed to have been prepared by all of the parties and that no party shall be entitled to the benefit of any favorable interpretation or construction of any term or provision hereof under any rule or law.

Q.     WAIVER OF JURY TRIAL.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS DEALER AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY AND (D) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

R.     Protection of Confidential Information; Authorization.  Each party recognizes that the other party has and will continue to develop certain trade secrets, know-how, records, manuals, correspondence, documents, financial and sales information, reports, customer lists, policies, procedures, proposals, marketing plans, ideas, concepts, services and any other proprietary information which is confidential (collectively "Confidential Information"). Each party agrees that, upon the termination of this Agreement, such party will immediately deliver to the other all papers, books, manuals, lists, correspondence, documents and materials relating to the other party's Confidential Information, together with all copies and embodiments of all of the foregoing including, without limitation, electronically stored records, databases, programs, computer disks and computer software. Each party further agrees that such party will not at any time reveal any Confidential

Seller _____

Information of the other party to any other person or otherwise use the Confidential Information of the other party for any purpose other than as specifically set forth herein. It is understood that Confidential Information does not include any information that is publicly available through no fault of the receiving party. Notwithstanding anything set forth above, Omnisure shall be entitled to (i) provide customer payment information, funding information regarding Seller and other related information to any software vendor and/or licensor from which Seller licenses or otherwise has use of software related to the administration of the Accepted Contracts and/or Purchasers, (ii) provide information regarding Seller to any Administrator as deemed necessary by Omnisure (including information regarding Events of Default), and (iii) report Events of Default and other Seller infractions hereunder to any governmental authority or oversight body.

S.  **Severability.** Whenever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law; but if any provision hereof or the application thereof to any party or circumstance is prohibited by or invalid under applicable law, such provision shall be effective only to the minimal extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions hereof or the application of such provisions to other parties or circumstances.

T.  **Disclaimer; Consequential Damages.** Except as explicitly set forth in this Agreement, Omnisure does not make any warranties of any kind, either expressed or implied, including, without limitation, (a) warranties of merchantability or fitness for a particular purpose, (b) that its services hereunder will meet Seller's requirements, (c) that Omnisure will include any Contract in the Payment Plan Program, or (d) as to the results that Seller may achieve on account of the relationship created hereby. In no event shall Omnisure have any liability to Seller for any loss of data, lost profits, costs of procurement of substitute goods or services, or any other special, indirect, punitive, incidental, exemplary or **consequential damages (whether direct or indirect), whether based in contract, tort (including negligence) or any other theory of liability, even if Omnisure has been advised of the possibility of such damages. In addition, Seller hereby agrees and acknowledges that Omnisure is not liable to Seller in any way or in any amount on account of any damages and/or losses suffered by Seller, or alleged to be suffered by Seller, on account of any action taken prior to the date hereof by Omnisure, and Omnisure shall have no liability to Seller on account of any decisions regarding the Advance Rate, offsets or inclusion of a Contract within the Payment Plan Program.**

U.  **Certain Acknowledgments.** Seller hereby agrees and acknowledges that: (1) the Seller Profit is earned by the Seller from the Administrator rather than Omnisure, as Seller is not providing any services to, for or on behalf of Omnisure, (2) Omnisure's advance of a portion of the Seller Profit is an accommodation to the Administrator; (3) all amounts due and owing by a Purchaser under any Accepted Contract (other than the Down Payment, to which Seller has rights only on account of the assignment of such rights by the Administrator) are and will be payable solely to Omnisure (and to the extent any such payments are deemed to be payable to Seller for any reason, Seller hereby assigns all rights to such payments to Omnisure).

V.  **Non-Solicitation.** Seller hereby agrees that during the term of this Agreement and for a period of 2 years thereafter, it will not solicit or hire any employees or contractors of Omnisure, as well as any former employees or contractors who were employed or engaged by Omnisure at any time during the term of this Agreement.

W.  **Successors.** This Agreement and all of the terms and provisions hereof shall be binding upon and shall inure to the benefit of the parties, their respective legal representatives, heirs, successors or assigns.

X.  **Entire Agreement.** This Agreement contains the entire understanding among the parties and supersedes any prior understandings and/or written or oral agreements among them respecting the within subject matter. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties hereto relating to the subject matter hereof that are not fully expressed herein.

Y.  **Fees and Costs; Taxes.** Omnisure shall be entitled to recover from Seller all costs and expenses, including, without limitation, reasonable attorneys' and paralegals' fees, incurred by Omnisure in connection with Omnisure's enforcing any of Omnisure's rights or remedies under this Agreement. Seller shall be responsible for the payment of all taxes due and owing in connection with the relationship created by this Agreement (other than Omnisure's income taxes).

Z.  **Notices.** Any notices, offers, acceptances and other communications required hereunder shall be in writing and deemed to have been given and received (i) when personally delivered or upon transmission of a facsimile (with confirmation of transmission), (ii) one day after being sent by a nationally recognized overnight courier with guaranteed next day delivery, or (iii) three days after being mailed by United States certified mail, return receipt requested, postage prepaid, to the parties at their respective addresses as set forth below or at such other address as such party may designate by notice hereunder.

Seller _TAB_

AA.     Assignment.  No party may assign its rights or delegate any duties under this Agreement without the express prior written consent of the other party; provided, however, that Omnisure and its permitted assignees may pledge some or all of its rights hereunder and any documents, instruments or agreements arising therefrom or related thereto, including assigning such rights, documents, instruments and agreements to any third party that provides financing to Omnisure.

BB.     Pronouns and Headings.  As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction.  The headings, titles, and subtitles herein are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

CC.     Survival of Rights.  Except as otherwise specifically provided to the contrary in this Agreement, no termination (regardless of cause or procedure) of this Agreement shall in any way affect or impair the power, obligation, duties, rights and liabilities of Seller or Omnisure relating to (i) any transaction or event occurring prior to such termination, (ii) any Accepted Contract existing as of the date of termination of this Agreement, or (iii) any of the undertakings, agreements, covenants, warranties and representations of Seller or Omnisure with respect to (i) and (ii) above.  All such undertakings, agreements, covenants, warranties and representations shall survive such termination or cancellation.

DD.     Rights of Creditors and Third Parties under this Agreement.  This Agreement is entered into between Seller and Omnisure for the exclusive benefit of Seller and Omnisure and their respective successors and permitted assigns and is expressly not intended for the benefit of any other party.  Except for lenders of Omnisure which have been granted a security interest in certain accounts, and only to the extent provided by applicable law, no other creditor or third party shall have any rights under this Agreement.

EE.     Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall be deemed to be one Agreement.  Signatures transmitted by facsimile shall be considered authentic and binding.  In addition, signatures e-mailed in a "Portable Document Format" version of this Agreement or within a "Tagged Image File Format" version of this Agreement shall be considered authentic and binding.

FF.     Further Assurances.  Each party agrees to do all acts and things and to make, execute and deliver such written instruments, as may from time to time be reasonably required to carry out the terms and provisions of this Agreement.

GG.     Title to Accepted Contracts.  Seller hereby acknowledges and agrees that title to Accepted Contracts (including all agreements relating thereto and all amounts owing by a Purchaser thereunder) shall at all times be vested in Omnisure and its assignees, and neither Administrator nor the Seller shall have any right, title or interest therein.

HH.     Applicability.  This Agreement shall apply to all Accepted Contracts and all other Contracts financed by Omnisure prior to or following the execution hereof.

*(Signature Page to Follow)*

Seller 

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first set forth above.

**NATIONAL REPAIR PROTECTION, LLC**

Signature: _____

Print Name: Todd A Beikmann

Title: Managing Member

Address: _____
City, State, Zip: _____
Phone: _____
Fax: _____

**OMNISURE GROUP, LLC**

Signature: _____

Print Name: Paul M Walker

Title: Managing Member

Address: 440 N. Wells, Suite 410
City, State, Zip: Chicago, IL 60654
Phone: (312) 836- 0400
Fax: (312) 822- 9302

## APPENDIX A
### SCHEDULE

**Discount Amount:**

| Number of payments | 0-3 | 4-6 | 7-12 | 13-15 | 16-18 | 19-24 |
|---|---|---|---|---|---|---|
| Discount fee | 3% | 4% | 6% | 6.5% | 7.75% | 9.25% |

**Cancellation Pricing:**

| Payments Made | Discount Amount Earned Per Contract |
|---|---|
| 0 | $5 |
| 1 | $10 |
| 2 | $15 |
| 3 | 25% |
| 4 | 35% |
| 5 | 50% |
| 6 | 70% |
| 7 | 90% |
| 8 | 100% |

**Reserve Amount:**   $75 per contract

**Advance Amount:**   80%

Page 12 of 16

Seller _____

## APPENDIX B
### VOICE CONFIRMATION DISCLOSURE

Congratulations on the purchase of your *Admin, Inc.* protection plan for your vehicle from *XYZ Seller*! You have selected *X Plan Brand* for _____ months or _____ miles, whichever occurs first. During this period you will be provided *Y Coverage Type* plan on your vehicle. Your protection plan has a waiting period, so coverage will commence at the sooner of the passing of _____ days and _____ miles from your current odometer statement. (This should be consistent with the vehicle service contract sold). Your policy will have a deductible of _____ for the term of the policy.

You will receive a full contract containing all terms and conditions in the mail shortly. Please contact us at *(800) 123-4567* if you do not receive your package. Upon receipt of your contract, please be sure to review the coverage, terms, conditions and exclusions to confirm it meets your needs. You have _____ days from today, *(June 1st)*, to review your coverage and are entitled to a full refund during this period. (This should be consistent with the vehicle service contract sold). After 30 days, you are entitled to a pro-rata refund, subject to claims paid and any cancellation fees outlined in the contract.

The contact information we have on file is *Mr. John Q.* Customer located at *123 Main Street, City, State 12345*. Your email address is John.Smith@email.com. You have elected a down payment of *$200* and *12* installment payments of *$150.00* which will be processed by our payment processor *Omnisure Group*. The total cost of your protection plan is *$2,000* [OR You have elected to pay for your contract in full at this time for *$2,000*.]

Your monthly payment will be charged to your Visa credit card account number ending in *1234* on or around the *5th* day of each month starting *July 5, 2011*. At this time, we will need your voice verification of these terms and conditions and to authorize the charges to your account.

Do you authorize a charge today of *$200*?
Do you authorize *12* monthly charges of *$150* beginning on *July 5th* and each month thereafter until your balance is paid in full? (Need to receive a verbal YES.)


X Plan Brand = Administrator's Brand Name

Y Coverage Type Options: Exclusionary, Named Component, Powertrain

Seller 

## APPENDIX C
### PRODUCER OWNED REINSURANCE COMPANIES

The following is a list of any and all Producer Owned Reinsurance Companies (PORC) or Retro Program Agreements:

| PORC Name: NONE | Owner(s): | Administrator(s): |
|---|---|---|
| | (1) | |
| | (2) | |

| Retro Program: NONE | Owner(s): | Administrator(s): |
|---|---|---|
| | (1) | |
| | (2) | |

### OR

✓ Seller has no relationships with PORCs or Retro Programs (please check if applicable)

Agreed acknowledged this _13ᵗʰ_ day of _October_, 2014.

By: _Todd A. Birkmann_

Print Name: _Todd A. Birkmann_

Title: _Managing Member_

Seller _TAB_

**APPENDIX D**

POWER OF ATTORNEY

BE IT KNOWN, that National Repair Protection, LLC, a Florida limited liability company ("Seller"), upon Omnisure's verifiable receipt and presentation of either (i) a VPA attorney determining in writing that Seller has ceased all sales activities, or (ii) Seller's written notice that Seller has ceased all sales activities, or (iii) a determination by Omnisure that Seller has ceased all sales activity based on Seller's failure to present to Omnisure any Contracts for inclusion in the Payment Plan Program for a period of 10 consecutive days without prior written notice that Seller will remain in business but will no longer conduct business with Omnisure, has made and appointed, and by these presents does make and appoint, Omnisure Group, LLC, a Delaware limited liability company ("Omnisure"). true and lawful attorney for Seller and in Seller's name, place and stead, for the following specific and limited purposes only:

Communicating with Seller's telephone service providers and/or other Telecom companies (including, without limitation, those providers and/or companies listed below), and signing on behalf of Seller any and all agreements, forms or other documents necessary, to transfer, at Seller's expense, all of Seller's telephone lines to Omnisure or otherwise in accordance with instructions to be provided by Omnisure

giving and granting Omnisure, full power and authority to do and perform all and every act and thing whatsoever necessary to be done in and about the specific and limited premises (set out herein) as fully, to all intents and purposes, as might or could be done if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that Omnisure shall lawfully do or cause to be done by virtue hereof. Neither Omnisure nor any of Seller's telephone service providers or Telecom companies shall be liable to Seller or any third party in any way on account of actions taken in reliance on this Power of Attorney. This Power of Attorney is coupled with an interest and will be irrevocable until such time as the Seller Agreement is fully and finally terminated in accordance with the terms set forth therein.

IN WITNESS WHEREOF, the undersigned has hereunto set its hand this 31 day of October, 2014. Signed and delivered in the presence of:

_____
Witness

_____
Witness

SELLER NAME: National Repair Protection, LLC

By: _____

Print Name: Tedd A. Beikmann

Title: Managing Member

| Name of Each Telcom | Contact Information at | Telcom Company Address | Seller's Customer Service | Seller's Sales Telephone |
|---|---|---|---|---|
| AT&T | Stephanie Kargianian | SK1548@att.com | 877-811-4040 x24536 | Saul |
| | | | | |
| | | | | |

NOTARY:
STATE OF Kansas
SS COUNTY OF Johnson

I, Deborah L. Fitzgerald, a Notary Public in and for and residing in said County and State. DO HEREBY CERTIFY THAT Tedd A. Beikmann personally known to me to be the same person whose name is subscribed to the foregoing instrument on behalf of the "Seller", appeared before me this day in person and acknowledged that s/he signed and delivered said instrument as his/her own free and voluntary act for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this 31st day of Oct, 2014.

_____
Notary Public

My Commission Expires: 5-17-17

DEBORAH L. FITZGERALD
Notary Public
State of Kansas
My Commission Expires 5-17-17

Page 15 of 16

**APPENDIX E**
CONSENT REGARDING SOFTWARE PROVIDERS

National Repair Protection, LLC, a Florida limited liability company ("**Seller**") hereby agrees that (i) Omnisure Group, LLC, a Delaware limited liability company ("**Omnisure**"), shall be entitled to receive from any CRM Provider (as defined below) any and all reporting information regarding Accepted Contracts which may be in such CRM Provider's possession from time to time, and (ii) each CRM Provider shall be entitled to rely on this Consent, without any further action on the part of Seller and without the need for any further consent from Seller, and no CRM Provider shall be liable in any way on account of providing any information regarding Accepted Contracts to Omnisure. For purposes of this Consent, "**CRM Provider**" means Moxy, Forte Data Systems and any other vendor who provides Seller with software or services for customer relations management (including, without limitation sales activities, marketing, customer service, and technical support, or the generation of agreements between customers and Seller).

Agreed and accepted this _30th_ day of _October_, 2014.

By: _____

Print Name: _Tedd A. Brikmann_

Title: _Managing Member_

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") is entered on October 29, 2014 by and between Omnisure Group, LLC, a Delaware limited liability company ("Secured Party"), and National Repair Protection, LLC, a Florida limited liability company ("Company").

### RECITALS

WHEREAS, the Company and the Secured Party are parties to that certain Seller Agreement, dated as of October 29, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Seller Agreement"); and

WHEREAS, it is a condition to the transactions contemplated by the Seller Agreement that the Company shall have granted the security interests contemplated by this Security Agreement in favor of the Secured Party.

NOW, THEREFORE, in consideration of the premises and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### AGREEMENT

1.  Recitals. The recitals are hereby incorporated and made a part of this Security Agreement.

2.  Definitions. Capitalized terms used herein shall have the meanings set forth in Exhibit A attached hereto. Capitalized terms not defined herein shall have the meanings given to such terms in the Seller Agreement.

3.  Grant of Security Interest. To secure the prompt payment and performance to Secured Party of the Seller Obligations, Company hereby grants to Secured Party a continuing security interest in all of the Collateral, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Seller Obligations.

4.  Representations, Warranties and Covenants. Company hereby represents and warrants to, and covenants with, Secured Party, as follows:

    (a)     Company (i) is an organization duly organized, validly existing, and in good standing under the laws of the State of Florida; (ii) has power and authority to own its properties and assets and to carry on its business as now conducted and as proposed to be conducted; and (iii) is qualified to conduct business in every jurisdiction set forth in the New Seller Profile;

    (b)     Except for any Lien in favor of Secured Party, or as otherwise consented to in writing by Secured Party, Company is or will be the owner of all the Collateral free from any Lien, security interest or encumbrance and Company will defend the Collateral against any and all claims and demands of all persons, other than Secured Party, at any time claiming the same or any interest therein;

    (c)     Company has the authority to enter into this Security Agreement and the person signing on Company's behalf has been duly authorized by all necessary acts to execute this Security Agreement;

    (d)     Company's state issued organizational identification number is set forth on Schedule 4(c). The exact legal name of Company is as set forth on Schedule 4(c). Except as provided for Schedule 4(c), Company currently does not conduct, nor has it in the last five years conducted, business under any other name or trade name;

    (e)     No less than 30 days prior to the effective date thereof, Company will notify Secured Party in writing of any change in Company's name, type of organization, organizational identification number, or jurisdiction of organization or the use of any assumed name by Company. Company shall, as a condition to making effective any of the foregoing, deliver to Secured Party any and all financing

Page 1 of 9

Company _JAB_

statements, and execute and deliver all other documents reasonably requested by Secured Party in connection with any of the foregoing and as a condition to making effective any of the foregoing;

(f) Except for any existing lien in favor of Secured Party, or as otherwise consented to in writing by Secured Party, no other financing statement covering any of the Collateral is on file in any public office;

(g) No Collateral is now, nor shall any Collateral at any time or times hereafter be stored with a bailee, warehouseman or similar party without Secured Party's prior written consent, and in such event, Company will concurrently therewith, upon the demand of Secured Party cause the warehouseman, bailee or similar party within 15 business days of the date thereof, to acknowledge in writing Secured Party's security interest and to cause its records to reflect such security interest in form and substance reasonably satisfactory to Secured Party, and to cause such bailee, warehouseman or similar party to issue and deliver non-negotiable warehouse receipts or non-negotiable bills of lading in Company's name in form and substance reasonably satisfactory to Secured Party;

(h) Company will at all times keep accurate and complete records of the Collateral; and

(i) Company will promptly inform Secured Party of any default in payment or performance by Company or other persons or of claims made by any other person in regard to the Collateral.

5. **Use and Possession of Collateral.** Company may retain possession of the Collateral and, at its expense, keep and use the same in a manner consistent with applicable law, subject to Secured Party's rights hereunder

6. **Transfers; Location; Disposition of Collateral.** Company agrees that it will not sell or attempt to sell or assign, lease, license, mortgage, encumber or otherwise transfer the Collateral or any interest therein without the express, written authorization of Secured Party, except for (a) the Liens and security interest granted to Secured Party or otherwise permitted hereunder, and (b) sales, leases or other dispositions made in the ordinary course of business.

7. **Maintaining Collateral.** Company will maintain, preserve and keep the Collateral and every part thereof, in good repair and condition, reasonable wear and tear excepted, and from time to time will promptly make needful and proper repairs, replacements, renewals, additions, and betterments which may be required by reason of use, wear, obsolescence, damage or destruction, however caused, to the ends that the value of the Collateral shall be preserved and that the efficiency of the operation of the Collateral shall not be impaired, except as permitted in Section 6.

8. **Proceeds of Sale, Loss, Destruction or Condemnation of Collateral.** Except for dispositions of Collateral not prohibited under this Security Agreement or the Seller Agreement, to the extent the Collateral is sold, lost, destroyed or taken by condemnation, Company shall immediately pay to Secured Party, as and when received by Company, a sum equal to the net cash proceeds (including insurance payments) received by Company from such sale, loss, destruction or condemnation for application to any Seller Obligations. Notwithstanding the foregoing, upon the prior written consent of Secured Party, such proceeds shall not be applied in repayment of any Seller Obligations so long as (a) such proceeds are used to repair or replace such sold, lost, destroyed or condemned Collateral with Collateral of comparable value and usefulness in the operation of Company's business within six months following such disposition; (b) no Event of Default has occurred and is then continuing; (c) Company has delivered notice to Secured Party of the occurrence of the sale, loss, destruction or condemnation, the projected effect on Company's business and Company's proposed use of the proceeds within 30 days of such disposition, (d) such loss, sale, destruction or condemnation has not resulted in a material adverse effect on Company's business, properties or prospects, as determined in Secured Party's sole discretion; and (e) the use of the proceeds would not result in an Event of Default under this Security Agreement or the Seller Agreement.

9. **Inspection of Collateral.** Company will, upon prior notice of at least two business days from Secured Party (unless an Event of Default then exists, in which event, no prior notice will be required), permit

Company _TAB_

Secured Party, its agents and representatives, to periodically inspect the Collateral at any reasonable time during the term of this Security Agreement, at Company's cost and expense.

10. **Defense of Collateral.** Company, at its sole cost and expense, will protect and defend the Collateral or any part thereof against all claims therein or thereto, or any interest therein, and will keep the Collateral free from any other lien, security interest or encumbrance except as permitted hereby, or unless Company is contesting such lien and, to the extent such lien, security interest or encumbrance seeks to subordinate or be senior to Secured Party's interest in said Collateral, has delivered a bond or other security to Secured Party satisfactory to Secured Party. Company will pay all other claims and charges which, in the reasonable opinion of Secured Party, could prejudice, imperil or otherwise adversely affect the Collateral or its security interest therein.

11. **Payment of Taxes.** So long as any part of the indebtedness hereby secured shall remain unpaid, Company will pay all personal property taxes and other governmental charges levied or assessed against the Collateral or any part thereof, or for its use or operation, or upon this Security Agreement, before the same become delinquent, and on demand will promptly furnish Secured Party with receipts showing such payment. Company will not permit the Collateral, or any part thereof, to be levied upon or sold for any tax or assessment whatsoever, nor will it permit to be done to, in, upon or about the Collateral, anything that may in any way impair the value thereof, or the security intended to be afforded by this Security Agreement.

12. **After Acquired Property.** All after acquired property covered hereby and all additions or replacements to the Collateral acquired by Company shall immediately be and become, without any other act, conveyance or mortgage on the part of Company, subject to the security interest and Lien of this Security Agreement, which shall be prior to any other security interest or Lien on such addition or replacement, except as otherwise subordinated by applicable law or agreement.

13. **Liens and Encumbrances.** Except for Liens in favor of Secured Party, or otherwise consented to in writing by Secured Party, Company shall not, without the prior written consent of Secured Party, create, incur or permit to exist any Lien with respect to the Collateral.

14. **Authorization.** Company hereby irrevocably authorizes Secured Party at any time and from time to time to file in any Uniform Commercial Code jurisdiction any initial financing statements and amendments thereto and to indicate therein (a) that the Collateral (i) consists of all assets of Company or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of the Uniform Commercial Code of any applicable jurisdiction, or (ii) consists of a portion of the assets of Company with such detail as Secured Party may deem appropriate, and (b) any other information required, in Secured Party's discretion, by the Uniform Commercial Code in any relevant jurisdiction for the sufficiency or filing office acceptance of any financing statements or amendment, including (i) whether Company is an organization, the type of organization and any organization identification number issued to such Company and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Company agrees to furnish any information reasonably requested by Secured Party to facilitate the objectives of this paragraph. To the extent applicable, Company also ratifies its authorization for Secured Party to have filed in any applicable Uniform Commercial Code jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof

15. **Verification of Accounts.** Upon the occurrence and continuation of an Event of Default, Secured Party's nominee, together with any of Secured Party's officers, employees or agents shall have the right, at any time or times hereafter, in the name of a nominee of Secured Party, to verify the validity, amount or any other matter relating to any accounts by mail, telephone, facsimile or otherwise. All reasonable costs, fees and expenses relating thereto incurred by Secured Party (or for which Secured Party becomes obligated), including the reasonable costs of retaining Secured Party's nominee shall be paid by Company upon the written demand of Secured Party.

16. **Appointment of Secured Party as Attorney-In-Fact After an Event of Default.** Company irrevocably, hereby designates, makes, constitutes and appoints Secured Party (and all Persons designated by Secured Party) as its true and lawful agent and attorney-in-fact from and after an Event of Default and during the continuation thereof, with power, without notice to Company, and at such time or times hereafter as Secured Party, in its sole and absolute discretion, may determine, in Company's or Secured Party's name (a) to do all acts and

Page 3 of 9

Company *TAB*

things necessary, in Secured Party's sole discretion, to enforce the Liens granted to Secured Party hereunder, and (b) to prepare, file and sign Company's name on any notice of lien, assignment or satisfaction of lien or similar document.

17.     **Action by Secured Party.**  Following the occurrence and during the continuation of an Event of Default, Secured Party may, but need not, make any payment or perform any act herein required of Company in any form and manner deemed expedient by it, and may, but need not, purchase, discharge, compromise or settle any tax lien or other lien, security interest, or other encumbrance at any time levied or placed on the Collateral. All monies paid for any of the purposes herein authorized and expenses paid or incurred in connection therewith, including reasonable attorneys' fees, and any other monies advanced by Secured Party to protect the Collateral and the security interest and lien hereof, shall be additional indebtedness secured hereby and shall become immediately due and payable without notice and with interest thereon at the daily interest rate of the lesser of (a) 1.5% per month or (b) the highest interest rate allowed under applicable law ("Default Rate"). Inaction of Secured Party shall never be considered a waiver of any right accruing to it on account of any default on the part of Company.

18.     **Insurance and Protection of Collateral.**  Company will insure and keep insured, with insurance companies reasonably satisfactory to Secured Party, the Collateral which is of a character usually insured by entities similarly situated and as may otherwise be required by Secured Party; and will insure such other hazards and risks (including employers' and public liability risks) to the extent usually insured by entities similarly situated in conducting similar businesses and as may otherwise be required by Secured Party. All such insurance shall be in such amounts, with such deductibles, under such policies and terms and issued by such insurers, customary and usual for companies engaged in the same or similar business as consistent with coverage, deductibles and rated insurers maintained by the Company today, and as are reasonably acceptable to Secured Party. Company will cause Secured Party to be named as a lender's loss payee and additional named insured on all such insurance policies and shall cause all such policies to contain a prohibition against cancellation, modification or amendment without 30 days prior written notice to Secured Party and, following the occurrence of an Event of Default, at the request of Secured Party, Company shall collaterally assign such insurance to Secured Party as additional security for the Seller Obligations. Company will deliver to Secured Party, upon the signing of this Security Agreement and, at the request of Secured Party from time to time hereafter, a certificate evidencing Company's compliance with its obligations hereunder and, at Secured Party's request, a certificate setting forth in summary form the nature and extent of the insurance maintained pursuant to this Section 18.

19.     **Illinois Collateral Protection Act.**  Unless Company provides Secured Party with evidence of the insurance coverage required by this Security Agreement, Secured Party may purchase insurance at Company's expense to protect Secured Party's interest in the Collateral. This insurance may, but need not, protect Company's interests. The coverage that Secured Party purchases may not pay any claim that Company makes or any claim that is made against Company in connection with the Collateral. Company may later cancel any insurance purchased by Secured Party, but only after providing Secured Party with evidence that Company has obtained insurance as required by this Security Agreement. If Secured Party purchases insurance for the Collateral, Company will be responsible for the costs of that insurance, including interest and any other charges Secured Party may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Company's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Company may be able to obtain on its own.

20.     **Event of Default.**  The occurrence of any of the following shall be an Event of Default:

(a)     The occurrence of any Event of Default specified in the Seller Agreement, which is incorporated by this reference as fully and with the same effect as if set forth herein, shall constitute an "Event of Default" hereunder;

(b)     Company's failure to comply with any of the provisions of, or the incorrectness of any representation or warranty contained in this Security Agreement;

(c)     Attachment, execution or levy on any of the Collateral;

(d)     Secured Party's receipt at any time following the execution of this Security Agreement of information indicating that Secured Party's security interest is not prior to all other security interests.

Company _TAB_

21. **Remedies Upon Default.** Upon the occurrence of an Event of Default, any sums secured hereby may become immediately due and payable, without further notice to Company, together with the Default Rate from the date of the first of any such Event of Default. After the indebtedness secured by this Security Agreement shall have become due and payable, whether by lapse of time or by acceleration, or otherwise, then and in any such event, Secured Party shall have the remedies for such default of a "secured party" under the UCC or otherwise available to it under applicable law including, without limitation, the right to take immediate and exclusive possession and control of the Collateral or any part thereof. Secured Party shall be entitled to hold, maintain and preserve and prepare the Collateral for sale, until disposed of or or may propose to retain the Collateral pursuant to applicable law. Secured Party may require Company to assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to Company and Secured Party. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will give Company reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of reasonable notice shall be met if such notice is given to Company at least ten days before the time of the sale or disposition.

22. **Fees and Expenses.** In case of any suit or foreclosure at law or in equity by any person whomsoever relating to or affecting the Collateral, or any part thereof, or the title thereto, wherein Secured Party shall be a party, the reasonable and necessary costs, charges and attorneys' and paralegals' fees and expenses of Secured Party therein shall be allowed to Secured Party, and shall be additional indebtedness secured hereby and shall be paid out of the proceeds of sale of the Collateral if not otherwise paid by Company.

23. **Successors and Assigns.**

(a) The terms used to designate any of the parties herein shall be deemed to include their respective successors and assigns, and the term "Secured Party" shall also include any lawful owner, holder or pledgee of the indebtedness secured hereby. All representations, warranties, covenants, powers and rights herein contained shall be binding upon, and shall inure to the benefit of, Company and Secured Party and their respective legal representatives, successors and assigns;

(b) Company may not assign its rights and/or obligations under this Security Agreement, without express, written authorization of Secured Party;

(c) Secured Party may assign its rights and interests under this Security Agreement, rendering performance to assignee. Company waives and will not assert against any assignee any claims, defenses, or setoffs that Company could assert against Secured Party except for those defenses that cannot be waived.

24. **Waiver.** No waiver of any default shall operate as a waiver of any other default or of the same default on a future occasion. All rights and remedies of Secured Party hereunder shall be cumulative and shall be in addition to any other right and remedy given hereunder or now or hereafter existing at law or in equity or by statute.

25. **Further Assurances.** Company will join with Secured Party in executing such documents, instruments, financing statements, continuation statements, partial releases and termination statements as Secured Party may deem necessary or appropriate to perfect Secured Party in the Collateral, pursuant to the Uniform Commercial Code as from time to time in effect in the State of Illinois. A photographic, carbon or other reproduction of this Security Agreement shall be sufficient as a financing statement. At the request of Secured Party, Company will also pay for filings and searches in connection with third party subordinations and may, from time to time, execute additional or supplemental agreements to confirm Secured Party's security interest upon items or types of Collateral in connection with said business now existing or hereafter acquired, or the validity or priority thereof.

26. **Severability.** Any provision of this Security Agreement which is prohibited or unenforceable in any jurisdiction shall as to such jurisdiction be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

27. **Governing Law.** This Security Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, without giving effect to such state's conflicts of law provisions.

Company _TAB_

28. **Counterparts.** This Security Agreement may be executed in any number of counterparts and by facsimile, and all such counterparts taken together shall be deemed to constitute one instrument.

29. **Beneficiaries.** It is expressly intended, understood and agreed that this Security Agreement and the Seller Agreement are made and entered into for the sole protection and benefits of Company and Secured Party, and their respective successors and assigns and no other person or persons shall have any right at any time to action hereon or rights provided hereunder.

30. **Termination.** This Security Agreement is made for collateral purposes only and the duties and obligations of Company under this Security Agreement shall terminate when the Seller Obligations are repaid in full and satisfied.

31. **Waiver of Jury Trial.** COMPANY WAIVES ANY RIGHT TO TRIAL BY JURY ON ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS SECURITY AGREEMENT, THE SELLER AGREEMENT, OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT WHICH MAY BE DELIVERED IN THE FUTURE IN CONNECTION WITH SUCH DOCUMENTS OR (B) ARISING FROM THE TRANSACTIONS CONTEMPLATED BY SUCH DOCUMENTS, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

32. **Jurisdiction and Venue.** COMPANY IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THE SELLER AGREEMENT OR THIS SECURITY AGREEMENT SHALL BE LITIGATED ONLY IN COURTS HAVING SITUS WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS. COMPANY HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN SAID CITY AND STATE. COMPANY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE VENUE OF ANY SUCH ACTION OR PROCEEDING.

33. **Notices.** Any notice, demand, request or other communication which any party hereto may be required or may desire to give hereunder shall be deemed to have been given if made in accordance with the terms of the Seller Agreement.

IN WITNESS WHEREOF, the parties have executed and delivered this Security Agreement as of the date first set forth above.

NATIONAL REPAIR PROTECTION, LLC

Signature: _____
Print Name: Todd A. Beikmann
Title: Managing Member

Address: _____
City, State, Zip: _____
Phone: _____
Fax: _____

OMNISURE GROUP, LLC

Signature: _____
Print Name: Paul M Walder
Title: Managing Member

Address: 440 N. Wells, Suite 410
City, State, Zip: Chicago, IL 60654
Phone: (312) 836-0400
Fax: (312) 822-9302

Company _____

## EXHIBIT A

"Collateral" shall mean all of Company's assets, including all of the following property and interests in property of Company, whether now owned or existing or hereafter created, acquired or arising and wheresoever located: Accounts (as defined in the UCC); Certificated Securities (as defined in the UCC); Chattel Paper (as defined in the UCC); Commercial Tort Claims (as defined in the UCC); Contract Rights; Deposit Accounts (as defined in the UCC); Documents (as defined in the UCC); Electronic Chattel Paper (as defined in the UCC); Equipment (as defined in the UCC); Financial Assets (as defined in the UCC); Fixtures (as defined in the UCC); General Intangibles (as defined in the UCC); Goods (as defined in the UCC), and all accessions, additions, attachments, improvements, substitutions and replacements thereto and therefor; Health Care Insurance Receivables (as defined in the UCC); Instruments (as defined in the UCC); Intellectual Property Rights; Inventory (as defined in the UCC); Investment Property (as defined in the UCC); money (of every jurisdiction whatsoever); Letter of Credit Rights (as defined in the UCC); Payment Intangibles (as defined in the UCC); Security Entitlements (as defined in the UCC); Software (as defined in the UCC); Supporting Obligations (as defined in the UCC); Tangible Chattel Paper (as defined in the UCC); Uncertificated Securities (as defined in the UCC); and to the extent not included in the foregoing, all other personal property of any kind or description; together with all books, records, writings, data bases, information and other property relating to, used or useful in connection with, or evidencing, embodying, incorporating or referring to any of the foregoing, all accessions to the foregoing and all substitutions, renewals, improvements and replacements of and additions to the foregoing, and all Proceeds, products, offspring, rents, issues, profits and returns of and from any of the foregoing; provided that, to the extent that the provisions of any lease or license of any Software or Intellectual Property expressly prohibit (which prohibition is enforceable under applicable law) any assignment thereof, and the grant of a security interest therein. Secured Party will not enforce its security interest in Company's rights under such lease or license (other than in respect of the Proceeds thereof) for so long as such prohibition continues, it being understood that upon request of Secured Party, Company will in good faith use reasonable efforts to obtain consent for the creation of a security interest in favor of Secured Party (and to Secured Party's enforcement of such security interest) in Secured Party's rights under such lease or license.

"Company" shall have the meaning set forth in the Preamble.

"Contract Rights" shall mean any right of Company to payment under a contract for the sale or lease of goods or the rendering of services, which right is at the time not yet earned by performance.

"Event of Default" shall have the meaning set forth in Section 20.

"Intellectual Property Rights" shall mean all past, present and future: trade secrets, know-how and other proprietary information; trademarks, internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights (including copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world and all tangible property embodying the copyrights, unpatented inventions (whether or not patentable); patent applications and patents; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income there from; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

"Lien" shall mean any interest, including a security interest, in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on common law, statute or contract. The term "Lien" shall also include rights of seller under conditional sales contracts or title retention agreements, reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting property.

"Person" shall mean any individual, partnership, corporation, limited liability company, joint stock company, land trust, business trust, or unincorporated organization, or a government or agency or political subdivision thereof.

"Proceeds" shall have the meaning set forth in Section 9-102(a)(64) of the UCC and, in any event, shall include all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

Company _JAB_

"Security Agreement" shall have the meaning set forth in the Preamble.

"Secured Party" shall have the meaning set forth in the Preamble.

"UCC" means the Uniform Commercial Code as in effect on the date hereof and from time to time in the State of Illinois, provided that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect on or after the date hereof in any other jurisdiction. "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy.

* * * * *

Company: TAB

SCHEDULE 4(c)

Company's Organizational ID Number:            L14000119919

Exact Legal Name of Company:                   National Repair Protection, LLC

Company *TAB*

## GUARANTY AGREEMENT

THIS GUARANTY AGREEMENT ("Guaranty") is made and entered into as of October 29, 2014 by and between Omnisure Group, LLC, a Delaware limited liability company ("Omnisure"), and Todd Beikmann, Richard J. Podhorn, and Thomas Neubarth("Guarantor").

Whereas, Omnisure provides financing for the purchase price of service contracts or product warranties (the "Contracts") that are sold by National Repair Protection, LLC, a Florida limited liability company and its parents, subsidiaries and affiliates (collectively, the "Seller"):

Whereas, the rights and obligations of Omnisure and the Seller are set forth in that certain Seller Agreement, dated October 29, 2014 by and between Omnisure and the Seller (as amended, restated, supplemented or otherwise modified from time to time, the "Seller Agreement"), a copy of which has been received and reviewed by the Guarantor (capitalized words not otherwise defined herein shall have the meaning set forth in the Seller Agreement).

Whereas, the Guarantor (a) is the owner, principal or managing member of Seller; (b) is engaged in business as a corporate affiliate or subsidiary; or (c) will otherwise derive financial benefit from the sale of the Contracts and the transactions contemplated by the Seller Agreement.

Now, therefore, Guarantor hereby absolutely, unconditionally and irrevocably guaranties (a) the full and prompt payment to Omnisure of all amounts owed to Omnisure by the Seller under or in connection with the Seller Agreement and (b) the prompt, full and faithful performance and discharge by the Seller of the terms, conditions, agreements, representations and warranties on the part of the Seller contained in the Seller Agreement (collectively, the "Guaranteed Obligations"). Without limiting the generality of the foregoing, the Guarantor hereby agrees to indemnify Omnisure from and against any and all damages, losses, claims, liabilities, costs and expenses (including reasonable attorneys' fees and disbursements) awarded against or incurred by Omnisure or its members, managers, officers, agents, employees, successors or assigns, as a result of the failure of any Contract (or purported Contract) to be in full force and effect in accordance with the information provided by or on behalf of the Seller, even if such Contract never existed or such failure is due to any fraud, negligence or other misconduct on the part of the Seller.

In order to hold Guarantor liable hereunder and to enforce this Guaranty, there shall be no obligation on the part of Omnisure at any time to take or commence any action against the Seller or any person, firm or corporation or to any collateral, security, property, liens or other rights or remedies of Omnisure in respect to the Guaranteed Obligations or any part thereof, all of which are hereby expressly waived by Guarantor.

All diligence in collection, and all presentment for payment, demand, protest and/or notice of protest, dishonor, default or nonpayment, and notice of the creation and existence of any Contracts and of any security therefor, and of the acceptance of this Agreement, or extensions of credit or indulgences hereunder or of any other matters or things whatsoever relating hereto are expressly waived.

The granting of additional credit from time to time by Omnisure to the Seller in excess of the amount currently extended to the Seller, without notice to Guarantor, is hereby expressly authorized and shall not affect or impair this Guaranty.

The obligations of the Guarantor hereunder shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any Guaranteed Obligation is rescinded or must otherwise be returned by Omnisure upon the insolvency, bankruptcy or reorganization of the Seller or otherwise, all as though such payment had not been made.

In the event Omnisure shall sell, assign or transfer its rights under the Seller Agreement, or any part thereof, or grant participations therein, each and every immediate or remote successive assignee, transferee, holder of or participant therein, of all or any part of such rights shall have the right to enforce this Guaranty by suit or otherwise for the benefit of such assignee, transferee holder or participant, as fully as if such assignee, transferee

holder or participant were herein by name specifically given such rights, powers and benefits; but Omnisure shall have an unimpaired, prior and superior right to enforce this Guaranty for its benefits as to so much of such rights as it has not sold, assigned or transferred.

No release or discharge of the Seller from any portion of the Guaranteed Obligations, or of any other person, whether primarily or secondarily liable for and obligated with respect to the Guaranteed Obligations, or the institution of bankruptcy, receivership, insolvency, reorganization, dissolution or liquidation proceedings by or against any person, or the entry of any restraining or other order in any such proceeding, shall release or discharge Guarantor, or any other person, firm or corporation liable to Omnisure for the Guaranteed Obligations, unless and until all of the Guaranteed Obligations shall have been fully and indefeasibly paid in cash.

No delay on the part of Omnisure in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Omnisure of any right or remedy shall preclude other or further exercise thereof, or the exercise of any other right or remedy; nor shall any modification or waiver of any of the provisions of this Agreement be binding upon Omnisure except as expressly set forth in a written duly signed and delivered on behalf of Omnisure. No waiver on the part of Omnisure in the exercise of any right or remedy shall operate as a waiver of such right or remedy with respect to any subsequent circumstances or events. No action of Omnisure permitted hereunder shall in any way affect or impair the rights of Omnisure and the obligation of Guarantor under this Guaranty.

The obligations of the undersigned under this Guaranty are irrevocable, absolute and unconditional, irrespective of (a) the value, genuineness, validity or enforceability of the Transaction Documents (as defined below), (b) any substitution, release or exchange of any other guarantee of or security for the amounts payable by the Seller under or in connection with the Transaction Documents, (c) any failure by the Omnisure to acquire, perfect, or maintain any security interest or lien in, or take any steps to preserve its rights to, any security for the Guaranteed Obligations or any portion thereof or the liability of any other guarantor of any or all of the Guaranteed Obligations, and (d) to the fullest extent permitted by applicable law, any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense to payment of a surety or guarantor, including without limitation fraud in the inducement or in fact, or running of a statute of limitations. As used in this Guaranty, "Transaction Documents" means, collectively, (i) the Seller Agreement, (ii) the Contracts, (iii) any insurance policies issued by the Guarantor in connection with the Contracts (each a "Policy") and (iv) any and all other instruments, documents and agreements between Omnisure and the Seller relating to the Contracts.

The obligations of the Guarantor under this Guaranty shall not be subject to any abatement, termination, setoff, counterclaim or recoupment whatsoever or any right related thereto, and shall not be released or discharged other than by payment hereunder. Without limiting the generality of the foregoing, it is agreed that the existence of any one or more of the following defenses to payment (with or without notice to the Guarantor) shall not alter or impair the Guarantor's liability hereunder, which shall remain irrevocable, absolute and unconditional as described above, (i) any person or entity that is party to, or is a direct or indirect beneficiary of, any of the Transaction Documents (a "Transaction Party") shall fail to make any of the representations or warranties contained in any Transaction Document accurately and completely in any respect and/or at any time (whether such failure is innocent, negligent, in bad faith, reckless, intentional or otherwise), (ii) any Transaction Party shall have failed to disclose, or shall fail to disclose, any fact or circumstance to the Guarantor, whether or not such fact or circumstance would be material to the agreement by the Guarantor to execute and deliver this Guaranty, (iii) any Transaction Party shall fail to pay any premium in respect of any Policy or shall fail to satisfy any other condition in respect of any Transaction Document, (iv) any Transaction Party shall fail to perform any covenant or obligation in any Transaction Document, (v) the time for any performance of or compliance with any Transaction Document shall be extended, or such performance or compliance shall be waived, (vi) any lien or security interest granted to or for the benefit of the Guarantor or Omnisure by any Transaction Party as security for any indebtedness, obligation or liability shall fail to be perfected or shall prove to be unenforceable, (vii) the Guarantor did not take steps necessary or appropriate to underwrite the risks under this Guaranty, (viii) the Guarantor relied upon information, statements, data or any other material provided by or on behalf of any Transaction Party in executing and delivering this Guaranty, (ix) the Guarantor did not make its own independent decision to execute, deliver and be bound by this Agreement based upon its own judgement, (x) any Transaction Party was acting as a fiduciary or an advisor to the Guarantor in respect of the Contracts, the Policies or any other Transaction Document or (xi) the bankruptcy or insolvency of or any reorganization, arrangement, compromise, composition or plan affecting any Transaction Party shall occur, or

this Guaranty or any Transaction Document shall be rejected or limited in any bankruptcy, insolvency or similar proceeding.

This Guaranty shall be governed by and construed in accordance with the laws of the State of Illinois. Wherever possible each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

EACH PARTY IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT SHALL BE LITIGATED ONLY IN COURTS SITTING WITHIN THE CITY OF CHICAGO, STATE OF ILLINOIS. EACH PARTY HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN SAID CITY AND STATE. EACH PARTY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE VENUE OF ANY SUCH ACTION OR PROCEEDING.

EACH PARTY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING (I) TO ENFORCE OR DEFEND ANY RIGHTS UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (II) ARISING FROM ANY DISPUTE OR CONTROVERSY IN CONNECTION WITH THIS AGREEMENT AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

Omnisure shall be entitled to recover from Guarantor all costs and expenses, including, without limitation, reasonable attorneys' and paralegals' fees, incurred by Omnisure in connection with Omnisure's enforcing any of Omnisure's rights or remedies under this Guaranty. Guarantor shall be responsible for the payment of all taxes due and owing in connection with the relationship created by this Guaranty (other than Omnisure's income taxes).

This Guaranty, and each and every party hereof, shall be binding upon Guarantor and upon the heirs, legal representatives, successors and assigns of Guarantor and shall inure to the benefit of Omnisure, its successors and assigns. This Guaranty is a continuing guaranty and agreement and shall remain in full force and effect until one year and one day after the date on which the Seller Agreement has been terminated in accordance with its terms and all Guaranteed Obligations have been indefeasibly paid in full in cash.

IN WITNESS WHEREOF, the parties have executed this Guaranty as of the date set forth above.


OMNISURE GROUP, LLC:

By: _____
Name: Paul M Valdez
Title: Managing Member


GUARANTOR:

By: _____
Name: Todd Brikmann

By: _____
Name: Richard J. Podhorn

By: _____
Name: Thomas Neubarth